Good morning, everyone. Welcome. Our first case for argument this morning is United States v. Jackie Edwards. Mr. Pearson. Good morning, and may it please the Court. My name is Tyler Pearson, and I represent the appellate cross-appellee, Mr. Jackie Edwards, in this matter. Your Honors, we are here today to ask this Court to reverse the District Court's decisions on Mr. Edwards' motion to suppress evidence, motion for judgment of acquittal, and motion for new trial. The District Court's decision regarding Mr. Edwards' motion to suppress evidence was incorrect for three reasons. First, the November 15, 2017 seizure and subsequent search and arrest of Mr. Edwards was not merely a Terry stop. It was an arrest from the outset. Second, no probable cause existed to support the warrantless seizure and subsequent search and arrest of Mr. Edwards. And third, even if this Court were to find that the search and seizure of Mr. Edwards amounted to merely a Terry stop, there existed no specific or articulable facts sufficient to support reasonable suspicion. Turning to my first point, the November 15, 2017 seizure and subsequent search of Mr. Edwards was not merely a Terry stop. It was an arrest from the outset. Mr. Pearson, what role did Mr. Edwards play in escalating that interaction? Your Honor, I don't know if he played much of a role at all besides driving his car from his home to his lawful place of business when he was approached by four plain-clothed armed officers immediately after he parallel parked his vehicle. Was there a difference in Mr. Edwards' behavior before and after the gun was recovered? Didn't appear that there was. Mr. Edwards appeared to remain pretty calm throughout the entire encounter. Mr. Edwards inquired many times why he was being stopped. Mr. Edwards even asked the officer that approached his window with a loaded AR-15-style assault weapon if he wanted to see his license or insurance, at which time the agent in question responded, Do I look like a effing traffic cop to you? In United States v. Boris, this court held that relevant factors in determining whether a reasonable person would feel free to leave include the conduct of the police, the person of the individual citizen, and the physical surroundings of the encounter. Now turning to the first factor, the conduct of the police. If we back up for a moment, what are, because we're asking this question for analysis, is whether or not this was a cherry-stopper detention, what are the facts that led up to the stop? Your Honor, Mr. Edwards was ancillary to an interstate DEA drug-related investigation. His phone calls that were made to and from his phone were intercepted by the DEA in St. Louis, and it was believed at that time that he may be involved, to some extent, in drug trafficking. Later on, it was determined if there was any involvement at all, it would be merely as a purchaser, not as a trafficker, not as a distributor. Mr. Edwards was surveilled for several days leading up to the November 15, 2017 encounter. The officers had intended to obtain a search warrant for his home in Richland Park, and according to their statements and testimony at trial, and according to the government's multiple contentions throughout their briefs and motions, they were minutes away from obtaining a search warrant to search his home. Now that night, just preceding him being stopped, he left his home and drove to 69th and Racine, where his lawful place of business was located. It's approximately 26 miles from his home, and it took about a half an hour to get there. There were some facts, though, that the officers were relying on before they made the decision to begin trailing, or using your word, surveilling Mr. Edwards. Is that correct? That's correct, Your Honor. There had been an individual they were also surveilling that had arrived at Mr. Edwards' house and left a short time thereafter. DEA had coordinated with the Illinois State Police, who conducted a traffic stop of that individual, who it was later found had a large amount of cash. I believe it was about $30,000, but he was never charged. He was never arrested. Did he make any statements? Yes, he did indicate that only about $9,000 of that $30,000 approximately that was seized was from Mr. Edwards, and if I recall, it was to purchase a vehicle. Was there any conversation regarding a firearm? There was 900 total intercepts involved in this case. I'm sorry, I'm just referring to the day previous. The day previous, on November 14th, there was one isolated call whereby Mr. Edwards was speaking to another individual in relation to what he believed was information he was receiving about potentially being the target of a robbery. And during that call, and I believe the exact quote is in reference to him on his way to the police station to make a report about this suspected attempted robbery, he made a statement about not having a firearm in his possession. In fact, the statement was that the firearm was at his house. Now going back to the 15th, or going forward a day, St. Louis Task Force Officer Buds was the only officer who actually listened to that intercept, and he had relayed what he believed was an indication that he might be armed onto the officers in Chicago. Even if the implication isn't that he was armed at the time as a convicted felon, his statement with regard to possession of a pistol is relevant, correct? It would be relevant if the time between the statement and the stop were not so long. A day? A day, Your Honor. In fact, the district court had indicated that when asking the government at trial, what you're trying to say is he said he didn't have a gun, and you're trying to use that as a basis to stop him a day later. And essentially asking the government if that would pass muster, and the government conceded no. And the statement wasn't that he had a firearm, Your Honor, and I think that is what this case turns on. It wasn't a statement inculpating himself. If anything, it was exculpating himself. It was a statement in the negative about possessing a firearm. Well, at that moment. Correct, but it wasn't a statement that could reasonably be construed. It was one single, isolated statement. It's not a statement that could reasonably be construed or interpreted to mean that he regularly possesses a firearm, or as has been relayed from officer to officer in this case, which essentially amounts to a really bad game of telephone. By the time it reaches officers on the ground, they all have the belief that Mr. Edwards is somehow all over these telephone intercepts bragging about having a firearm. That could not be further from the truth. But the passage from the intercept reflects that he referred to the gun as his gun. That's true, Your Honor. Right, so that does support a reasonable inference that he owned a gun and might have been in possession of it at the time the officers stopped him. If they had stopped him on November 14th, Your Honor, I would agree. The problem is the statement is a single, isolated statement saying he does not have a gun, and the statement occurred one day prior to the stop. When looking at the conduct of the police in this case, when judging whether or not this was a Terry stop or an arrest, I think it's clear this was an arrest from the outset. But isn't the question, was it reasonable? Yes. The reasonableness of the stop? Yes. The problem is the officers and the government have changed their reasoning several times. First, it was because they were minutes away from getting a search warrant. Then it was because of the telephone intercept the day prior. All the while, the telephone intercept is being miscommunicated, misinterpreted, and those misinterpretations are needlessly inflating this associated risk that they're associating with Mr. Edwards. When they stopped Mr. Edwards, they didn't ask any questions. In a Terry stop, the whole purpose of a Terry stop is it's investigative in nature. Inherent in an investigation for any law enforcement officer would be to ask the suspect questions. They didn't ask him anything. In fact, they didn't even take his license. They didn't take his insurance. They shouted commands at him. They surrounded his vehicle as it was parallel parked in front of his lawful place of business. And they pointed guns at him. Well, it wasn't a traffic stop. He was parked. They were surveilling him, but he had parked the car. And they stopped him to see if he was carrying the gun that he mentioned in the intercept the day before when he was talking about going into the city that day. But he had to get his gun first before he went into the city. So there's clearly a reasonable basis for a Terry stop here. The question is whether it escalated to Judge Brennan's question and ripened into a full-blown arrest, and if so, when that occurred. But it was clearly initiated as a temporary detention to determine if he was carrying the gun that he mentioned in the intercept the day before. That wasn't Officer Billiott's testimony at trial, Your Honor. At trial, he said the reason for the stop was because they were minutes away. Subjective reasons don't matter. We're talking about an objective test here. Understood. There's an objective basis for a Terry stop. That's correct, Your Honor. Supplying reasonable suspicion. And the question is whether at some point along that continuum between a Terry stop and a full-blown arrest, the detention ripened into an arrest requiring probable cause. That's correct, Your Honor. And we don't believe that this ever was – there was no reasonableness for this stop to begin with based on the time that elapsed between the statement and the substantive statement itself. You mean the day, the one day? One day, Your Honor. And the statement was, again, it was not that he carried a firearm, that he always carried a firearm, that he had a habit of carrying a firearm, that he always had a firearm on him whenever he left the home. It was simply saying that he didn't have his firearm on him and that he was on the way to the police station. In regards to the time we have remaining, in regards to the sentencing argument that was regarding T, maybe we should spend some time talking through why are we not bound and finding voluntary manslaughter to be a crime of violence. Your Honor, I am very interested in discussing that. I do want to reserve the remaining time that I do have for rebuttal, and I have every intention of addressing that on rebuttal. Thank you. All right, thank you. Mr. Erskine. May it please the Court, my name is Andrew Erskine, and I represent the United States. Your Honor, the District Court correctly denied the motion to suppress in this case. As Judge Sykes just noted, there was an objective basis for the Terry stop that took place on November 15th. Now, going to Judge Sykes' question about when, if at all, it converted from a Terry stop to an arrest, it clearly ultimately did reach an arrest because he was charged. But the agents and officers were not able to affect that arrest because of the defendant's continued noncompliance and resistance. And so by the time that agents and officers were finally able to get control of the defendant and the situation, they had already felt the hard object in his pocket and then ultimately taken the gun out of his pocket shortly thereafter. And clearly at that point, at a minimum, it was an arrest. Because he was resisting the frisk. He was resisting even the frisk. They were never able to conduct the investigative stop at any point because he first didn't come out of the car. And then when he finally came out of the car, he continued to move his body, denying access to the right side of his coat where the gun was ultimately found. And the surveillance video reflects precisely that. Precisely that. And even after he was taken to the ground, placed in handcuffs, and brought back to his feet, he still continued to move his body, denying them access to pat down that right side of his body. After Officer Campbell eventually, as reflected in the video, was able to talk to him and basically persuade him orally, look, it's over, relax. Campbell was finally able to pat him down. And then as the video shows, pulled the gun right out of his pocket. And then of course at that point, the defendant was under arrest. Mr. Erskine, let's talk a little bit about the trial. The district court here struck the opening statements. That's a pretty drastic step here. What is your argument with regard to how that does not, should not result in a new trial? So, Your Honor, clearly that's an uncommon occurrence in trials. The, it, so of course opening statements are not evidence. All the points that the defense wanted to make and did make during the opening statement, they made fully during the closing summation, pointing to the evidence that had actually been admitted. In this case, it's critical to keep in mind that judge, the district court judge's decision to strike both openings, it wasn't just the defense openings, it was both openings, was because both sides lodged challenges, had issues with the contents of the other's opening. And then ultimately, and the issues the government took with the defense's opening were the very things that had been, the parties had been arguing about over and over again. And it was what was brought to the court's attention beforehand. And then the defense gave its opening, which the government objected saying it was essentially a 1983 case opening. And then the next day, the government asked that the court find that the door had been opened, because this was the issue that was being litigated. But I need to back up to the government's opening. Yes. The district judge rules that you are not permitted, government, to talk about the drug investigation. Correct. It's clear. We make a record. We had already ruled in the motion to eliminate as to what you could and could not say. The government, in its opening statement, presents this as DEA agents who conduct an investigatory stop in their opening. Yes. Essentially. And so it certainly is the case that the government said it was Drug Enforcement Administrative, or DEA, agents and officers following away a ban. At no point in time was it ever discussed you could not reference the agency that the agents and officers were from. And it is essentially universally the practice that agents are identified from the agency that they are from in the course of their trial. Most regularly in the beginning of their testimony. So it was certainly never talked about. And just to pause for a moment, the issue was should the jury learn anything about the broad Title III investigation that had been going on for the past couple weeks to give some context or understanding that this wasn't just a random, picking a random guy off the street and stopping him situation. And so when the government referred to the DEA, firstly, that had not been specifically addressed. And then on the second part, as far as, and I believe the language was something along the lines of, and the agents from the DEA were following a white SUV, and they decided to conduct an investigative stop. So that, it's referring not back to the past two weeks, it's referring to, okay, at this moment we're going to, you know, using the term of art, essentially do a traffic stop. It wasn't technically a traffic stop, but we're going to stop this vehicle and approach the person, as the video, you know, showed, and go from there. So here's the point that I'm making, is that even if you were to accept that those were incorrect or improper, our position is that they were not, because they were not, one was not addressed and one was not, neither addressed nor, you know, prevented by the spirit of the rulings. And the other was, again, use of the term of art, not referring to the Title III investigation. But even if you sort of, you could jump over the first part and get to the second part of the analysis, which is did they have any sort of serious negative effect that calls into questions or deny the defendant a fair trial, and the answer is absolutely not, because there's no reasonable interpretation of that small part of the opening, which can, you know, give you the impression that the jury was somehow clued in, read into the fact that the DA had been up on his phone, that they had surveilled a payment earlier that morning, that they had gotten a call the day before about an intercept, that there had been communications about marijuana trafficking. So all of that, consistent with the court's pretrial rulings, stayed out. I thought some of the background evidence came in after the defense opened the door. The tiniest bit and not even really. All that happened – there were two moments where this occurred. So Officer Campbell was on the stand, and that's where you had the series that the government took the position ultimately, and the court found, opened the door. And, Officer, this was in between cross and redirect. The witness is still on the stand. The witness had been told, do not talk about the past conduct, the past gun call. The court has ruled on this. Don't do it. Everyone knew that that's how the witnesses were supposed to be prepared. And so, as sidebar, the court ruled, yes, the door is open. You can ask this witness questions about background knowledge, about the gun and what he knew. And the door was open by virtue of what line of questioning? The line of questioning that immediately preceded that. So it was essentially defense counsels going through the video frame by frame, essentially, emphasizing – and this is against the backdrop of all the discussion we've had of the government opposing them, the defense trying to make it a 1983 case. And so then it's going frame by frame about the agents, the hands are on the defendant, the hands are on the defendant. Have they found the gun yet? No. Have they found the gun yet? Repeating it. And then ultimately getting to, oh, and by the way, did you know that the defendant was 55 years old? Clearly just going to the – speaking to and attacking the, quote-unquote, excessive force that was the case here. And knowing at the same time that the government at that point could not explain or give context to the actions of the agents, that they had received a call the day before where the defendant talked about having a pistol. So, of course, they were acting reasonably. So he said – the defense counsel says, did you know he's 55 years old? And then starts talking about the relative size of the defendant versus the agents. Shortly thereafter, tendered the witness. It's that sidebar right there after that the government made the motion. The judge granted it. But we put questions immediately to the witness still in the stand, and he was essentially having been told, don't say anything about the gun. All he said was, I had safety concerns, which is what he had already testified to. Fast forward to the end of the government's case in chief. The government was allowed to call the case agent, Yola Leck. That's the co-case agent. She's one of the – exactly. And she was sitting at a council table. And in a very sort of scripted fashion, before she took the stand, we all were working together on the precise language. She testified only that she was one of the case agents in the case. It's the responsibility – one of the responsibilities of the case agent is to be a clearinghouse of information. And on the day in question, she told the agents that the defendant might be armed. So that was the full extent of background information that got in before the jury. So nothing else about the drug investigation came in after the defense opened the door to some contextual questioning. Correct. And unless there are more questions on the suppression issue or the trial issue, I should say, I'd like to pivot to the cross-appeal. So the district court committed legal error when it ruled that the defendant's voluntary manslaughter conviction was not a crime of violence. The statute at issue in 1982, there were two ways it could be violated. Section 9-2A was when someone responds under a sudden and intense passion to serious provocation. And Section 9-2B, which is essentially unreasonable self-defense. And the court's ruling was incorrect because both of these versions were proceeding under the categorical method. Both of these versions require an intentional killing. 9-2B, the unreasonable self-defense, this requirement, the intentionality is plain on the face of the statute because it applies to, quote, a person who intentionally or knowingly kills. And then 9-2A, while the statute doesn't contain that same kind of explicit verbiage, it remains clear that it, too, is an intentional crime. That's from the Illinois case law at the time, including the Illinois Supreme Court case People v. Leonard, which they explicitly describe voluntary manslaughter as an intentional homicide. And also talk about, in the facts of that case, when the intentionality of the defendant to commit the murder occurred. Was it beforehand or during the course of the crime? We've already held that this is a qualifying predicate in the context of the parallel provision in the guidelines. In the Teague case, the current statute is just a replica of the old voluntary manslaughter statute. Yes, Your Honor. I mean, language is the same, basically? The statute was revised, but the changes are mostly procedural. But it's the… About burden shifting and so forth. About burden shifting. Right. So it's basically voluntary manslaughter. What was voluntary manslaughter is now second-degree murder. Yes. The Heat of Passion homicide crime in Illinois used to be voluntary manslaughter. Now it's second-degree murder. But the substance of it and the elements of it remain the same. Yes. It's an intentional homicide charge. Yes. And what Teague specifically addresses is this language within the statute, both the older version, applicable in this case, and the second-degree murder version now on the books, is this language from there about essentially killing the individual who created the provocation or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed. So it does have this language in it. You know, the word's negligent and accidentally, but as the court says in Teague, that's just referring to the concept of transferred intent. So it's still intentional homicide. And the judge engaged with none of this in her analysis. She basically said it's not fair to apply the enhanced penalty here because of the defendant's age and because this was something of a one-off in her view. That's correct. So there was no actual categorical analysis of the crime? Correct. And the PSR from which she was or that she adopted for purposes of the application of the ACC enhanced penalty just misunderstood the statute? The probation latched onto that language I just cited about accidental, the transferred intent language. They essentially looked at that and said, well, it appears this can be committed accidentally, so it shouldn't apply. Probation agents aren't lawyers. Correct. The categorical approach is hard enough for lawyers and judges. Correct. The judge should have done the analysis and did not. Correct. Unless there are any other questions, the government requests that this court affirm defendant's conviction and reverse the sentence and remand for resentencing. Thank you. Thank you. Mr. Pearson. Mr. Pearson, can we start kind of where we stopped and hit with the line of questioning regarding Teague? Yes, Your Honor. That case interpreting almost an identically worded statute rejected your argument as to why voluntary manslaughter is not a crime of violence. It did, Your Honor. However, it did address the Illinois statute as second degree murder. Mr. Edwards was, when the date of his conviction, the voluntary manslaughter was still enacted. And going back to the categorical approach, under that approach, the facts of a given case are irrelevant. And as Judge Sykes rightly pointed out, and the government rightly pointed out, the probation latched on to the negligence language in the elements of the voluntary manslaughter statute. And when you look at the intent behind ACCA, in Borden v. United States, and I quote, Mr. Edwards was 55 years old at the time of this conviction. Besides this decades old voluntary manslaughter conviction, Mr. Edwards doesn't have a violent history or a violent background, given his age, given the age of the conviction, given the circumstances of this case. That's not how the categorical approach works. It's a legal inquiry, not a factual inquiry into the defendant's particulars. Understood. I'm not hearing a legal argument. The statute for which Mr. Edwards was convicted under was prior to Teague. Teague did not address the Illinois voluntary manslaughter statute at the time it addressed the second degree manslaughter. It's the same in substance, is it not? It is the same in substance. The elements are the same. The elements are largely the same. But in essence, the government is asking this court to ignore the intent of the Illinois legislature, and including the Supreme Court. And in United States v. Johnson v. United States, the Supreme Court has deemed the violent felony portion of ACCA to be unconstitutionally vague. Not the section at issue here. Understood. Then why are you raising that argument? Mr. Edwards is not a armed career criminal under this Act. For these reasons, we would ask that you affirm the district court's ruling with regard to Mr. Edwards' sentencing, and we would ask that you reverse the district court's ruling on the motion to suppress evidence. Thank you. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement, and we'll move to our second hearing.